```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   UNITED STATES OF AMERICA  ) Docket No. A 15-CR-356(1) SS
                               )
 4   vs.                       ) Austin, Texas
                               )
 5   VICTOR ANTOLIK            ) October 28, 2016

 6
                       TRANSCRIPT OF SENTENCING
 7                 BEFORE THE HONORABLE SAM SPARKS

 8

 9   APPEARANCES:

10   For the United States:      Mr. David Zisserson
                                 U.S. Department of Justice
11                               Tax Division
                                 601 D Street N.W.
12                               Washington, D.C. 20004

13

14   For the Defendant:          Mr. Lowell H. Becraft, Jr.
                                 Law Office of Lowell H. Becraft, Jr.
15                               403-C Andrew Jackson Way
                                 Huntsville, Alabama 35801
16
                                 Mr. W. Stephen Brittain
17                               812 West 11th Street, Suite 207
                                 Austin, Texas 78701
18

19   Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
20                               Austin, Texas 78701
                                 (512)391-8792
21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.
```

**I N D E X**

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Witnesses: | | | | |
| Eduardo A. Tovar | 9 | 14 | | |
| Daniel Fannin | 22 | 27 | | |

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #A | 21 | 22 |
| #B | 21 | 22 |
| #C | 21 | 22 |
| #E | 21 | 22 |
| #G | 21 | 22 |
| Defendant's | | |
| #1 | 11 | 11 |

09:00:42  1          THE COURT:  This will be 15-CR-357, United States vs.

09:00:48  2   Victor Antolik.

09:00:51  3          I'll have announcements.

09:00:53  4          MR. ZISSERSON:  David Zisserson for the United States,

09:00:56  5   your Honor.

09:00:57  6          MR. BECRAFT:  Larry Becraft and Steve Brittain for the

09:01:00  7   defense, your Honor.

09:01:01  8          THE COURT:  All right.  Mr. Antolik, if you and your

09:01:15  9   lawyers would approach.

09:01:26 10          If you'll tell me your full name, please, sir.

09:01:28 11          THE DEFENDANT:  Victor John Antolik.

09:01:30 12          THE COURT:  And, Mr. Antolik, have you had the

09:01:33 13   opportunity to sit down with your lawyers and review the

09:01:35 14   presentence investigation made by the United States Probation

09:01:38 15   Department?

09:01:39 16          THE DEFENDANT:  Yes, I have.

09:01:40 17          THE COURT:  And with regard to the factual allegations

09:01:43 18   in that report, have you told your lawyers everything that you

09:01:48 19   know about those facts so that they can give you their best

09:01:52 20   advice?

09:01:53 21          THE DEFENDANT:  Yes, I have.

09:01:54 22          THE COURT:  Are you satisfied to date with the

09:01:56 23   representation that you've had with these two lawyers?

09:01:59 24          THE DEFENDANT:  Yes, sir.

09:02:00 25          THE COURT:  All right.  The United States Probation

09:02:10  1  Department has calculated in this case a guideline range of 41 to

09:02:14  2  51 months and, as indicated, that Mr. Antolik is 57 years of age.

09:02:26  3  He has virtually no criminal history.  He has criminal history

09:02:33  4  zero.  I have no objections -- well, I have one objection by the

09:02:39  5  government, and that is that an enhancement of obstruction.

09:02:47  6  Two-level increase should be placed on that modification, as well

09:02:59  7  as -- well, that's the only objection to it.

09:03:04  8         And I have, then, four objections.  One that Ceferino

09:03:09  9  Mata owns 45 percent of DBS Services, and it is stated to the IRS

09:03:20  10  liability is $39,556, according to the defendant.  He wants

09:03:30  11  struck the characterization with regard to the death of his first

09:03:33  12  wife.  And he wants a finding that he only owned 50 percent of

09:03:43  13  DBS partnership for the same reason as the others.

09:03:45  14         And we'll take those up one at a time, but I'll take

09:03:47  15  the government's first.  So y'all may sit down.

09:03:50  16         MR. BECRAFT:  All right.  Thank you, your Honor.

09:04:07  17         MR. ZISSERSON:  Thank you, your Honor.

09:04:09  18         Our objections to the PSR is that it doesn't include

09:04:16  19  the obstruction enhancement, and we think the evidence showed at

09:04:18  20  trial that, number one, Mr. Antolik fabricated the document.

09:04:23  21         THE COURT:  I'm familiar with the trial.  I've lived

09:04:25  22  that trial through all of these papers.  These papers just have

09:04:30  23  to do with sentencing that y'all favored me with.

09:04:35  24         So my real question is -- because I've talked with the

09:04:38  25  probation officer and the guidelines have never been an example

09:04:47  1  of logic, but there's no statement one way or the other.  So if I

09:04:54  2  was to give the enhancement for obstruction, I wouldn't need a

09:05:07  3  conviction.  And if I have a conviction, I don't need the

09:05:12  4  enhancement.

09:05:16  5         I'm triggered by the fact -- there's no question in my

09:05:20  6  mind that the defendant is guilty of the most obstruction.

09:05:25  7  That's no problem and he was convicted of it.  But it seems to me

09:05:34  8  as far as the calculation of the guidelines, it's double-counting

09:05:37  9  because the enhancement could be given even if you hadn't

09:05:43  10  indicted him for obstruction.

09:05:45  11         MR. ZISSERSON:  Well, your Honor, I don't believe it's

09:05:46  12  double-counting because the way, of course, you know, the tax

09:05:49  13  guidelines work is that the initial base offense is calculated by

09:05:52  14  the tax laws.  And then, the tax guidelines contemplate that on

09:05:57  15  top of that tax loss, if there's -- you know, if there's

09:06:00  16  obstruction, you can add some more.  And so, the particularly

09:06:05  17  fabricating the document and lying throughout his testimony, that

09:06:09  18  had no effect, really, on the calculation of the tax loss.  It's

09:06:13  19  almost a separate matter from it.

09:06:14  20         So we could have the calculation of the tax loss and

09:06:18  21  then, tack on those two points for obstruction and that's what --

09:06:20  22  you know, that's what the guidelines calculate -- contemplate.

09:06:23  23  So that's the government's position.

09:06:26  24         THE COURT:  That's what the guidelines calculate.

09:06:29  25  Well, we can't find it in the guidelines.  We don't find anything

09:06:33  1   that would say one way or the other.  I would agree with you a

09:06:40  2   hundred percent if you hadn't indicted him for obstruction, but

09:06:47  3   he is indicted for obstruction.  He's going to be sentenced on

09:06:52  4   obstruction, and I just don't see the logic in it, and I overrule

09:06:56  5   the objection.

09:06:57  6              MR. ZISSERSON:  Thank you.

09:07:04  7              THE COURT:  Does that conclude the government's?

09:07:06  8              MR. ZISSERSON:  That concludes our objections, your

09:07:07  9   Honor.  Thank you.

09:07:11  10             MR. BECRAFT:  Well, that solves one issue I have, your

09:07:13  11  Honor.

09:07:14  12             The other issue that I think -- can I offer the

09:07:18  13  evidence regarding the calculations of the tax loss?  I'd call

09:07:22  14  Eddie Tovar.

09:07:23  15             THE COURT:  Well, let's get the -- what we can out of

09:07:27  16  the way.

09:07:27  17             MR. BECRAFT:  Sure.

09:07:30  18             THE COURT:  Ceferino Mata.

09:07:33  19             MR. BECRAFT:  Well, I thought the Court addressed that

09:07:35  20  issue but --

09:07:35  21             THE COURT:  Well, I'm going to address it now, but

09:07:37  22  you've made objections to it and I want to clean the record up.

09:07:40  23  And you've put into the record that there was a finding in the

09:07:43  24  state court that he was the vice-president, or I think that was

09:07:49  25  right.

09:07:49 1        MR. BECRAFT:  That's correct, your Honor.

09:07:51 2        THE COURT:  Well, he was vice-president when your

09:07:53 3   client backdated four years of returns.  I saw Mr. Mata on the

09:07:59 4   stand, he didn't even know what day it was much less that he knew

09:08:02 5   that he was vice-president.

09:08:04 6        MR. BECRAFT:  Yeah.

09:08:05 7        THE COURT:  I saw the lady on the stand that she was an

09:08:08 8   officer.  They didn't much know that they were so endowed with

09:08:17 9   titles.  So that objection, for whatever it's worth, is

09:08:23 10  overruled.

09:08:23 11       Now, the second one is on the liability.  On the

09:08:29 12  characterization on the history, it's in there.  It will not be

09:08:39 13  public.  I seal all presentence reports.

09:08:43 14       MR. BECRAFT:  Okay.

09:08:44 15       THE COURT:  And there are responses all through the

09:08:48 16  materials that I've received both ways.  We have Mr. Antolik is

09:08:54 17  one of the great citizens of the world, and we have Mr. Antolik

09:08:58 18  as a person who is not a wonderful citizen, and, I mean, both

09:09:05 19  sides are endeared to their position.  So I'm not going to strike

09:09:12 20  that out of the guidelines.

09:09:17 21       The record is clear what happened there and that he

09:09:23 22  owns only 50 percent of the partnership, as we say in West Texas,

09:09:29 23  is B.S.  The jury found otherwise, anyway.  That's just another

09:09:35 24  one of the times he was trying to hide.  In this way, he's trying

09:09:38 25  to drop down from $204,000 of cash to $102,000, and I guess Mr.

09:09:48  1    Mata has the other.  Well, this court doesn't think so.

09:09:53  2          Now, we're down to yours.  If you want to present

09:09:55  3    evidence, you can.  I remember he testified in the trial, but

09:10:01  4    this is your --

09:10:03  5          MR. BECRAFT:  Well, I would like to briefly, your

09:10:05  6    Honor.

09:10:05  7          THE COURT:  That's fine.

09:10:06  8          MR. BECRAFT:  Could I say a couple of remarks?  Last

09:10:09  9    Thursday -- I wasn't, here but Mr. Brittain was -- the parties

09:10:13 10    got together.  They sat down and had a meeting.  Mr. Tovar was

09:10:19 11    there, the government was there, and they tried to resolve all

09:10:23 12    the differences about the tax loss.  So I think we've come pretty

09:10:27 13    close to understanding both sides.

09:10:30 14          But I would like to put on Mr. Tovar briefly to explain

09:10:34 15    what our position is and probably elucidate what the government's

09:10:39 16    position is in reference to the tax laws.  So with that in mind,

09:10:42 17    I'd like to call Mr. Tovar.

09:11:07 18          (Witness sworn.)

09:11:12 19          MR. BECRAFT:  For the benefit of the Court, I'll offer

09:11:16 20    15 exhibits.  I'd like to pass these copies.

09:11:26 21          THE COURT:  You know, we're not trying this case again.

09:11:29 22          MR. BECRAFT:  I understand, your Honor.

09:11:30 23          THE COURT:  So you gave me 15 exhibits when I've had

09:11:33 24    400 pages --

09:11:35 25          MR. BECRAFT:  Well, there are really only two that are

09:11:36  1  relevant, your Honor.

09:11:37  2          THE COURT:  Well, they're not any relevant.  I'm

09:11:39  3  letting you make a record.  Mr. Tovar took all of the statements

09:11:46  4  of your client and made returns on them.

09:11:51  5          MR. BECRAFT:  That's correct.

09:11:52  6          THE COURT:  And your client, in this judge's view from

09:11:56  7  everything I've known in this case and listening to today's

09:12:02  8  testimony, has no credibility.  He makes up things as he goes.

09:12:05  9  And so, none of Mr. Tovar's returns have any credibility as far

09:12:12  10  as I am concerned.

09:12:15  11          But we're going to let you --

09:12:17  12          MR. BECRAFT:  Okay.

09:12:17  13          THE COURT:  I'll let you put it in and make a record.

09:12:19  14  I don't want you to waste too much time.

09:12:21  15          MR. BECRAFT:  I'm not.  I'll just deal with two

09:12:23  16  exhibits, your Honor.

09:12:23  17      EDUARDO A. TOVAR, called by the Defendant, duly sworn.

09:12:23  18                     DIRECT EXAMINATION

09:12:24  19  BY MR. BECRAFT:

09:12:24  20  Q.   Mr. Tovar, state your name and what's your profession?

09:12:26  21  A.   Eduardo A. Tovar.  I am a CPA.

09:12:29  22  Q.   And how long has Mr. Antolik been a client of yours?

09:12:34  23  A.   Since 2009.

09:12:35  24  Q.   All right.  Now, for trial, you prepared a bunch of returns,

09:12:39  25  correct?

| | | |
|---|---|---|
| 09:12:40 | 1 | A.   Correct. |
| 09:12:40 | 2 | Q.   Now, can I direct your attention to Exhibit No. 1?  Can you |
| 09:12:47 | 3 | tell the Court what Exhibit No. 1 is? |
| 09:12:50 | 4 | A.   It is a summary of the tax harm that resulted from, I will |
| 09:12:58 | 5 | say, this trial. |
| 09:12:59 | 6 | Q.   Now, this is a summary of the returns that were offered into |
| 09:13:04 | 7 | evidence during the course of your testimony at trial.  Am I |
| 09:13:06 | 8 | correct? |
| 09:13:07 | 9 | A.   Yes. |
| 09:13:07 | 10 | Q.   And the calculations you got for each year are based upon |
| 09:13:15 | 11 | what records? |
| 09:13:16 | 12 | A.   Bank records. |
| 09:13:17 | 13 | Q.   And where did you get the bank records? |
| 09:13:19 | 14 | A.   From the IRS. |
| 09:13:21 | 15 | Q.   All right.  So prior to trial, you and Mr. Fannin sat down, |
| 09:13:24 | 16 | and he provided everything that had been provided to the defense |
| 09:13:27 | 17 | in discovery and provided that information to you. |
| 09:13:30 | 18 | A.   Yes. |
| 09:13:31 | 19 | Q.   And that is the documentation that you used to compile these |
| 09:13:36 | 20 | returns.  Am I correct? |
| 09:13:37 | 21 | A.   Yes. |
| 09:13:37 | 22 | Q.   Okay.  And what was the total amount of tax loss that you |
| 09:13:44 | 23 | derived, calculated based upon those documents? |
| 09:13:48 | 24 | A.   39,556. |
| 09:13:50 | 25 | Q.   All right.  Is it summarized in Exhibit No. 1? |

09:13:52  1   A.   It is.

09:13:53  2   Q.   All right.  Your Honor, move -- can I have Exhibit 1

09:13:58  3   admitted?

09:13:59  4          THE COURT:  Yes.  For the record, 1 is admitted.

09:14:04  5   Q.   (BY MR. BECRAFT) Now, can I get you to turn your attention

09:14:06  6   to Exhibit No. 11?  Do you have that in front of you?

09:14:16  7   A.   I do.

09:14:16  8   Q.   Now, what is your understanding when the government came

09:14:20  9   along and said there's a lot more due in the way of taxes?

09:14:26  10  A.   They provided us with an alternative computation.

09:14:29  11  Q.   And what was that alternative computation?

09:14:32  12  A.   It was assuming certain changes, constructive dividends.  I

09:14:38  13  don't recall all the changes.  There was a difference in gross

09:14:40  14  receipts, disallowance of the recognition of the loan, and

09:14:47  15  disallowance of the sales tax deduction in 2000.

09:14:49  16  Q.   All right.  Now, have you had an opportunity to review the

09:14:55  17  position of the government in that respect?

09:14:57  18  A.   I have.

09:14:58  19  Q.   Can you take a look at Exhibit No. 11?

09:15:01  20  A.   Okay.

09:15:02  21  Q.   Is this your calculation of taking into consideration the

09:15:06  22  government's objections what you calculated the tax to be?

09:15:10  23  A.   This is taking the government's alternative computation and

09:15:13  24  making three changes.  And I footnoted those changes.

09:15:16  25  Q.   All right.  What all -- can you tell the Court what those

09:15:19  1  changes were?

09:15:20  2  A.   So we basically deduct as compensation payments made or

09:15:26  3  benefits received by Mr. Antolik for the years 2000 through 2004.

09:15:37  4  We picked that income up personally as self-employment income.

09:15:41  5  Q.   Can I ask some questions about this?

09:15:43  6  A.   Sure.

09:15:43  7  Q.   Let me stop you right there.

09:15:44  8        The way the government calculated the income, you have

09:15:49  9  recalculated it differently.  Am I correct?

09:15:53  10  A.   I have, but I did not challenge them on this chart.

09:15:56  11  Q.   Okay.  And how was the government calculation -- you

09:16:00  12  mentioned something about income.  You took it off of a corporate

09:16:04  13  return and put it into a -- the individual returns?

09:16:08  14  A.   So I --

09:16:09  15  Q.   Dividends?

09:16:10  16  A.   I always use their gross receipts as a starting point.  So I

09:16:15  17  took their alternative computation and then, only made three

09:16:18  18  changes to it.  But I was starting with their numbers.

09:16:23  19  Q.   All right.  And what were the three changes?

09:16:25  20  A.   So the changes are footnoted.  It's basically we're going to

09:16:32  21  take as compensation on the corporate returns any benefits that

09:16:36  22  Victor Antolik received.  We're going to report that compensation

09:16:42  23  on his personal returns as self-employment income, and then,

09:16:45  24  we're going to deduct the sales tax deduction of $321,000 on his

09:16:50  25  Schedule A.  But I did make a note that we did not carry any net

09:16:56  1   operating loss that that generates back or forward.  We only used

09:16:59  2   it in the year 2000 and kept it very simple.

09:17:02  3   Q.   Now, Exhibit 11 summarizes your ultimate conclusions?

09:17:09  4   A.   Correct.

09:17:10  5   Q.   And for the year 2000, 2001, 2002, 2003, 2004, 2007, 2008,

09:17:16  6   those are the years that are relevant for this case?

09:17:20  7   A.   Correct.

09:17:21  8   Q.   And you've calculated for each year under your analysis of

09:17:25  9   the government's position the tax that would be due for each

09:17:28  10  year.  Am I correct?

09:17:29  11  A.   That is correct.

09:17:30  12  Q.   And then, the final column where you list total, it comes up

09:17:33  13  to be $471,683 is the tax loss?

09:17:36  14  A.   Yes.

09:17:37  15  Q.   And what was the government's estimate as to the tax loss?

09:17:41  16  A.   On their alternate computation, I think it was 677.

09:17:45  17  Q.   All right.  And which one -- which of those figures do you

09:17:48  18  believe is the correct amount of tax loss?

09:17:51  19  A.   I think mine is closer to the true number.

09:17:55  20  Q.   All right.  Nothing further, your Honor.

09:18:03  21        THE COURT:  The government have any questions?

09:18:06  22        MR. ZISSERSON:  Yes, your Honor.

09:18:15  23        THE COURT:  The last calculation I had was 900,000 from

09:18:21  24  the government.  You're down to 600,000?

09:18:24  25        MR. ZISSERSON:  No.  We have -- the 900,000 was the

09:18:26   1  calculation using the guidelines method.

09:18:28   2          THE COURT:  Right.

09:18:29   3          MR. ZISSERSON:  We provided as an alternative -- if the

09:18:31   4  Court didn't want to use that, we tried to take Mr. Tovar's

09:18:36   5  calculations and alter them by what we consider to be, you know,

09:18:39   6  the most incorrect items.

09:18:44   7          THE COURT:  And go ahead and question the witness.

09:18:46   8                      CROSS-EXAMINATION

09:18:46   9  BY MR. ZISSERSON:

09:18:47  10  Q.   Mr. Tovar, your calculations, the ones -- either set of your

09:18:53  11  calculations, those are based, in large part, on the bank records

09:18:56  12  of Mr. Antolik's businesses, correct?

09:18:59  13  A.   Correct.

09:19:00  14  Q.   And you and your staff went through those bank records and

09:19:03  15  attempted to reconstruct what expenses were, correct?

09:19:07  16  A.   Correct.

09:19:08  17  Q.   And inherent in that exercise, isn't there some level of

09:19:11  18  trust that you have to have in those bank records that when you

09:19:14  19  see an expenditure, it is a legitimate business expense?

09:19:18  20  A.   Some expenses would have that.

09:19:20  21  Q.   Okay.  So embedded in some of your treatment is an inherent

09:19:26  22  reliance on some of what your client told you or implied through

09:19:31  23  the bank records that those are real expenses.

09:19:33  24  A.   Correct.

09:19:34  25  Q.   Okay.  And so, for example, do you remember that there was a

09:19:39    1    -- this is just as an example, Mr. Tovar.

09:19:42    2            Do you remember that there was an expense for $90,000

09:19:45    3    in the later years of Mr. Antolik's real estate business for

09:19:54    4    rent?  Approximately $94,000 to rent.

09:19:57    5    A.   Correct.

09:19:58    6    Q.   And that $94,000 was being paid to entity called Cheval

09:20:02    7    Manor?

09:20:02    8    A.   Yes.

09:20:03    9    Q.   And do you know that Cheval Manor was owned at the time by

09:20:08   10    Mr. Antolik's brother?

09:20:09   11    A.   No.

09:20:09   12    Q.   Okay.  And do you know that at the time that Mr. Antolik was

09:20:13   13    living at Cheval Manor in 2008, according to his trial testimony?

09:20:17   14    A.   I did not know.

09:20:17   15    Q.   Okay.  And so, you trusted that when Mr. Antolik told you

09:20:20   16    this $90,000 expense is legitimate business expense, you trusted

09:20:25   17    him and included that in your computations.

09:20:27   18    A.   Well, no.  We conceded that issue last Thursday.

09:20:30   19    Q.   Okay.  But that is still in your computation?

09:20:33   20            THE COURT:  Listen to the question.

09:20:34   21            THE WITNESS:  Sure.  I'm sorry.

09:20:36   22            THE COURT:  Or we're going to be here a long time.

09:20:37   23    Q.   (BY MR. ZISSERSON) 90,000 is still in your computations

09:20:41   24    where you say that the tax loss is 39,000, that $90,000 is still

09:20:46   25    in those computations.

| | | |
|---|---|---|
| 09:20:47 | 1 | A.   You are correct. |
| 09:20:48 | 2 | Q.   And those computations are still -- that $90,000 is still in |
| 09:20:51 | 3 | your alternative computation now, too, correct? |
| 09:20:53 | 4 | A.   It is not in the alternative computation. |
| 09:20:55 | 5 | Q.   You're basing that on the government's figure, correct? |
| 09:20:59 | 6 | You're taking the government's alternative computation and |
| 09:21:01 | 7 | modifying it. |
| 09:21:02 | 8 | A.   So let me clarify because I don't want to answer |
| 09:21:06 | 9 | incorrectly. |
| 09:21:06 | 10 |    I was asked to rerun returns by Mr. Fannin assuming |
| 09:21:11 | 11 | certain concessions, which I did.  We removed the rent to Cheval |
| 09:21:18 | 12 | Manor and did not deduct that.  I ran that -- reran that |
| 09:21:23 | 13 | computation, provided that number to Mr. Fannin and then, from |
| 09:21:28 | 14 | there, made my adjustments.  But I did not deduct that. |
| 09:21:33 | 15 | Q.   Okay.  Mr. Tovar, do you remember that in -- you recall that |
| 09:21:37 | 16 | there was an expense in your calculations that was for an |
| 09:21:41 | 17 | attorney named Angus McGinty? |
| 09:21:43 | 18 | A.   Yes. |
| 09:21:44 | 19 | Q.   And you included that as an expense. |
| 09:21:46 | 20 | A.   In Exhibit 1 it is, but after concession, it was removed, as |
| 09:21:50 | 21 | well. |
| 09:21:50 | 22 | Q.   Okay.  You believe that to be removed in the second one. |
| 09:21:56 | 23 | A.   We discussed it and I believe it was removed. |
| 09:21:59 | 24 | Q.   Okay.  But is it in your first computation where you say the |
| 09:22:04 | 25 | tax loss is $39,000? |

```
09:22:06   1   A.    Yes, it is.

09:22:07   2   Q.    Have you seen any of Mr. Antolik's more recent bank records

09:22:09   3   for his business, Signature Realty Service?

09:22:13   4   A.    Can you define recent?

09:22:14   5   Q.    This summer.

09:22:16   6   A.    Do you mean 2016?

09:22:17   7   Q.    Yes.

09:22:18   8   A.    Only what you have provided.

09:22:19   9   Q.    Okay.  Have you seen --

09:22:23   10            THE COURT:  Have you seen June 24 to July 6th?

09:22:26   11            THE WITNESS:  Yes.

09:22:29   12   Q.    (BY MR. ZISSERSON) Have you seen this check before in Mr.

09:22:32   13   Antolik's bank records?

09:22:33   14   A.    No.

09:22:34   15   Q.    Can you see it on the screen in front of you?  Is it --

09:22:37   16   A.    I can make it out that it's legal fees for what appears to

09:22:41   17   be 45,000.  I cannot read the payer, payee's name.

09:22:45   18   Q.    Okay.  But is the screen in front of you on?

09:22:49   19   A.    Oh, yes.  Yes.  Larry Becraft.

09:22:52   20   Q.    Okay.  Now, Mr. Becraft is one of Mr. Antolik's attorneys

09:22:56   21   here today, right?

09:22:58   22   A.    Yes.

09:22:59   23   Q.    Mr. Becraft represented Mr. Antolik in this action, right?

09:23:04   24   A.    Correct.

09:23:04   25   Q.    Okay.  Now, this is a check from the Signature Realty
```

09:23:08  1  Service bank account, correct?

09:23:10  2  A.   Correct.

09:23:11  3  Q.   Signature Realty Service is Mr. Antolik's business.  That's

09:23:14  4  not his personal checking account, is it?

09:23:17  5  A.   That is not his personal checking account.

09:23:19  6  Q.   And here, he has a check to Mr. Becraft and the memo line

09:23:23  7  just says, legal fees, correct?

09:23:25  8  A.   Yes.

09:23:26  9  Q.   So this is a personal legal fee being paid from the business

09:23:29  10  bank account, correct?

09:23:30  11  A.   Correct.

09:23:31  12  Q.   And so, if you were to look at this years later, this would

09:23:35  13  appear, from just bank records, that that was a business expense,

09:23:38  14  wouldn't it?

09:23:39  15  A.   It would raise a question.

09:23:41  16  Q.   Because this is the type of thing Mr. Antolik does all over

09:23:44  17  the place, right?

09:23:48  18  A.   I can't speak to that.

09:23:49  19  Q.   Okay.

09:23:51  20       THE COURT:  In fairness, he was not present during the

09:23:54  21  trial.

09:23:59  22  Q.   (BY MR. ZISSERSON) Another item I just want to make clear,

09:24:02  23  Mr. Tovar, is that in both of your calculations, you're still

09:24:07  24  considering the sales tax -- taxes that Mr. Antolik paid to have

09:24:14  25  been an expense of DBS Services, correct?

| | |
|---|---|
| 09:24:17 | 1 |
| 09:24:23 | 2 |
| 09:24:27 | 3 |
| 09:24:33 | 4 |
| 09:24:36 | 5 |
| 09:24:43 | 6 |
| 09:24:45 | 7 |
| 09:24:47 | 8 |
| 09:24:50 | 9 |
| 09:24:53 | 10 |
| 09:24:53 | 11 |
| 09:24:55 | 12 |
| 09:24:58 | 13 |
| 09:24:59 | 14 |
| 09:24:59 | 15 |
| 09:25:09 | 16 |
| 09:25:14 | 17 |
| 09:25:21 | 18 |
| 09:25:25 | 19 |
| 09:25:26 | 20 |
| 09:25:28 | 21 |
| 09:25:33 | 22 |
| 09:25:37 | 23 |
| 09:25:40 | 24 |
| 09:25:44 | 25 |

A.    No.  So we spoke about this last Thursday, as well.  So you guys had an issue with alter ego, so we took it off the table. And then, I researched -- he did pay the 321.  That's not in question.  I researched whether he could deduct it personally, and he met the two-part test.  It imposed on him and he paid it in the calendar year.  So he's entitled to the deduction on his personal tax return, and that's why I gave it to him.

Q.    Okay.  You're not giving it to him in your new calculation. You're not giving it to him in the corporation.  The corporation is --

A.    I am not.  It is not the corporate tax return.

Q.    It's not on the corporate tax return in your original calculation, correct?

A.    Correct.

Q.    Okay.  Also, Mr. Tovar, for the issue of constructive -- for the issue of compensation to Mr. Antolik through DBS Services that your new calculations encompassed, you're not considering that compensation to be constructive dividends, are you?

A.    No.

Q.    You're considering that to be wages to Mr. Antolik?

A.    Not wages.  I'm considering it to be management fees that he -- management or consulting fees he would have been paid and, therefore, a deduction at the corporate level so as not to double-tax him on it; and then, he is picking it up as self-employment income.  He's paying self-employment tax on top

09:25:47  1   of the regular income tax on all those amounts.

09:25:49  2   Q.   Now, at the time, Mr. Antolik did not treat compensation as

09:25:55  3   management fees to himself in any way, did he?

09:25:58  4   A.   No.

09:25:59  5   Q.   At the time, Mr. Antolik paid himself a relatively small

09:26:02  6   amount of wages and reported that on a W-2, correct?

09:26:06  7   A.   Correct.

09:26:06  8   Q.   And so, the rest of these funds that you're crediting him

09:26:10  9   for in the account treatment that you just discussed, these were

09:26:14  10  just funds that he took out of the corporation on his own.

09:26:17  11  A.   Correct.

09:26:18  12  Q.   There was no management fee agreement or anything like that.

09:26:21  13  A.   Not that I'm aware of.

09:26:22  14  Q.   Okay.  So your accounting treatment is not reflecting any

09:26:26  15  type of arrangement that Mr. Antolik actually had with the

09:26:32  16  company at the time.

09:26:33  17  A.   Correct.

09:26:44  18  Q.   Those are all my questions, your Honor.

09:26:48  19        MR. BECRAFT:  Nothing further, your Honor, from this

09:26:50  20  witness.

09:26:51  21        THE COURT:  Your figure of $471,683, does it take into

09:26:57  22  consideration accounts that were in other people's names and that

09:27:04  23  he would just forge those names to get cash?

09:27:07  24        THE WITNESS:  Yes, sir.

09:27:07  25        THE COURT:  And how did you obtain all of that

09:27:09  1    information?

09:27:10  2         THE WITNESS:  I started with the government's numbers.

09:27:13  3    So I took all their information, used their alternative

09:27:16  4    computation and then, only made those three footnote changes.  So

09:27:20  5    I was starting with their framework and not bringing up any

09:27:23  6    issues to make it less argumentative.

09:27:26  7         THE COURT:  In the testimony that you provided in the

09:27:29  8    trial, you admitted that you were just operating under the

09:27:35  9    information that your client had given you, just like you had

09:27:39  10   before.  You had made some returns before then, correct?

09:27:44  11        THE WITNESS:  That's correct.

09:27:45  12        THE COURT:  And -- okay.  Thank you.

09:28:05  13        MR. BECRAFT:  That concludes my testimony in reference

09:28:07  14   to the issues regarding the hearing.

09:28:10  15        THE COURT:  All right.  In this particular objection,

09:28:16  16   does the government wish to present any evidence?

09:28:18  17        MR. ZISSERSON:  Yes, your Honor.  The government calls

09:28:20  18   Special Agent Daniel Fannin.

09:28:22  19        THE COURT:  All right.  If you'll come forward.

09:28:24  20        (Witness sworn.)

09:28:52  21        MR. ZISSERSON:  Your Honor, the Court is obviously well

09:28:56  22   familiar with the government's briefing on this issue and the

09:29:01  23   computations that we submitted.  And so, to save time, I would

09:29:05  24   like to just admit into evidence Government's Exhibits A, B, E

09:29:11  25   and G that were attached to the United States' sentencing memo.

| | | |
|---|---|---|
| 09:29:16 | 1 | If there's no objection from the defense. |
| 09:29:18 | 2 | MR. BECRAFT:  No objection, your Honor. |
| 09:29:18 | 3 | THE COURT:  All right.  A, B, E and G? |
| 09:29:21 | 4 | MR. ZISSERSON:  A, B, C. |
| 09:29:24 | 5 | THE COURT:  Okay. |
| 09:29:25 | 6 | MR. ZISSERSON:  E and G. |
| 09:29:27 | 7 | THE COURT:  A, B, C, E and G. |
| 09:29:31 | 8 | MR. ZISSERSON:  Yes. |
| 09:29:31 | 9 | THE COURT:  All right.  There's one thing I'm going to |
| 09:29:34 | 10 | want you to do, though, and that's provide copies to the clerk so |
| 09:29:37 | 11 | that the exhibits can be attached as to this particular hearing. |
| 09:29:44 | 12 | And you may state your full name and spell your last, |
| 09:29:46 | 13 | please. |
| 09:29:46 | 14 | THE WITNESS:  Daniel Fannin, F-A-N-N-I-N. |
| 09:29:51 | 15 | THE COURT:  You may proceed. |
| 09:29:53 | 16 | DANIEL FANNIN, called by the Government, duly sworn. |
| 09:29:53 | 17 | DIRECT EXAMINATION |
| 09:29:55 | 18 | BY MR. ZISSERSON: |
| 09:29:55 | 19 | Q.   Agent Fannin, we're not going to go over the computation to |
| 09:29:58 | 20 | the guidelines method.  That's what I just produced into |
| 09:30:01 | 21 | evidence.  But I would like to clarify a few things regarding the |
| 09:30:03 | 22 | government's alternative calculation and some of the ways that |
| 09:30:07 | 23 | Mr. Tovar characterized that.  Okay? |
| 09:30:09 | 24 | So if you could -- you have your binder in front of |
| 09:30:14 | 25 | you. |

| | | |
|---|---|---|
| 09:30:14 | 1 | A.   Yes. |
| 09:30:15 | 2 | Q.   If you can look at, please, Exhibit E, the government's |
| 09:30:23 | 3 | alternative calculation. |
| 09:30:24 | 4 | A.   Yes. |
| 09:30:25 | 5 | Q.   Can you describe how you came to this calculation? |
| 09:30:33 | 6 | A.   So I took the returns that Mr. Tovar had prepared that would |
| 09:30:43 | 7 | -- that constituted -- I believe, his first computation, $39,000. |
| 09:30:48 | 8 | Q.   Okay.  So you started with Mr. Tovar's first computation |
| 09:30:52 | 9 | that we've discussed now, the one that results in $39,000. |
| 09:30:57 | 10 | A.   Correct. |
| 09:30:57 | 11 | Q.   And that is the computation where he includes expenses from |
| 09:31:02 | 12 | bank accounts and the sales tax expense from the corporation, all |
| 09:31:09 | 13 | of those things that we've disputed previously. |
| 09:31:12 | 14 | A.   Correct.  And that also includes the $94,000 to Cheval |
| 09:31:19 | 15 | Manor, as well as some of those other expenses that he discussed |
| 09:31:23 | 16 | earlier. |
| 09:31:23 | 17 | Q.   Okay.  So when Mr. Tovar stated earlier that the $94,000 was |
| 09:31:29 | 18 | taken out of the government's alternative calculation, that was |
| 09:31:33 | 19 | not correct. |
| 09:31:33 | 20 | A.   There was a computation made, but that is not included in |
| 09:31:39 | 21 | this calculation. |
| 09:31:40 | 22 | Q.   Okay.  So just to be clear, this computation that's in front |
| 09:31:44 | 23 | of you in Exhibit E that results in the tax loss of 677, this |
| 09:31:50 | 24 | does not remove disputed expenses from Mr. Tovar's computation. |
| 09:31:58 | 25 | A.   No.  It accepts all expenses that he provided. |

09:32:02  1   Q.   All of the things that you as a special agent probably

09:32:07  2   wouldn't trust, those are still in here, anyway?

09:32:09  3   A.   Correct.

09:32:09  4   Q.   Okay.  So when you took Mr. Tovar's $40,000 approximate

09:32:14  5   computation, what did you do to change it then?

09:32:17  6   A.   So I alternated the gross receipts reflected on the

09:32:22  7   corporate tax returns.

09:32:23  8   Q.   Why did you alternate the gross receipts?

09:32:26  9   A.   There was -- I utilized the gross receipts what I -- as I

09:32:31  10  determined them to be based on my analysis of bank records and

09:32:34  11  client records.

09:32:35  12  Q.   Mr. Tovar mentioned that he reviewed bank records.  What did

09:32:39  13  you review besides bank records that gave you some additional

09:32:44  14  gross receipts above and beyond what Mr. Tovar was able to come

09:32:47  15  up with?

09:32:48  16  A.   The customer records and I compared the customer records to

09:32:51  17  bank records.

09:32:52  18  Q.   And what do you mean customer records?

09:32:54  19  A.   So a building manager that made payment for service --

09:33:01  20  janitorial services provided.  So that would include invoices

09:33:05  21  that had been submitted by the janitorial service and then,

09:33:10  22  copies of checks utilized to pay for those services.

09:33:12  23  Q.   And those were checks and payments that were not reflected

09:33:17  24  in the bank accounts that you had.

09:33:18  25  A.   There was some, yes.  There was, I believe, approximately

09:33:22  1   $70,000 in checks that I could not identify as having been

09:33:28  2   deposited into the bank accounts that had been identified.

09:33:32  3   Q.   Why is that?  Were there any additional bank accounts that

09:33:34  4   you didn't -- that you didn't subpoena?

09:33:37  5   A.   Correct.  There was at least one additional bank account for

09:33:42  6   which I was not able to obtain records.  It was in the name of

09:33:45  7   DBS with Jefferson State Bank.

09:33:47  8   Q.   Okay.  So there's -- in addition to all of the banks that we

09:33:51  9   saw at trial, the bank accounts, there's actually one -- you

09:33:54  10  believe there to be actually one more bank account.

09:33:56  11  A.   At least one more.

09:33:57  12  Q.   Okay.  So then, you -- the first thing you did to alter Mr.

09:34:00  13  Tovar's computation is that you adjusted the gross receipts for

09:34:05  14  the -- for what you calculated the gross receipts to be, right?

09:34:10  15  A.   Correct.

09:34:10  16  Q.   Okay.  What's the next thing you did?

09:34:13  17  A.   There was DBS Services filed a 1999 corporate income tax

09:34:22  18  return that reflected a $58,000 loss, so I carried it over into

09:34:29  19  -- as a net operating loss, carried forward onto the 2000

09:34:34  20  corporate return.

09:34:35  21  Q.   That actually gives Mr. Antolik a benefit?

09:34:37  22  A.   Correct.

09:34:38  23  Q.   And then, what's the final thing that you did to alter the

09:34:41  24  calculation?

09:34:49  25  A.   So I did not -- the sales tax payment of $321,000 in 2000

09:34:59   1    was attributable to a separate legal entity, Diversified Building

09:35:02   2    Services, Incorporated.  So I removed that from the computations

09:35:06   3    as an expense.  And then, the last thing that I did is, I treated

09:35:12   4    all corporate profits as distributed constructive dividends to

09:35:18   5    Mr. Antolik personally.

09:35:19   6    Q.    Okay.  Because let's just get at that a little bit.

09:35:24   7         After the calculations were made, DBS Services showed

09:35:30   8    profits for each year.

09:35:31   9    A.    Correct.

09:35:32   10    Q.    And you considered those profits, then, to have been

09:35:35   11    dividends paid to Mr. Antolik.

09:35:36   12    A.    Correct.

09:35:37   13    Q.    Okay.

09:35:39   14    A.    Now, if I could just clarify one thing.  So the first thing

09:35:43   15    that I mentioned -- or one of the first things I mentioned was

09:35:45   16    accepting all of the expenses presented by Mr. Tovar as, for lack

09:35:51   17    of a better term, allowable, I did not include that $321,000

09:35:57   18    sales tax that was paid personally by Mr. Antolik for a separate

09:36:02   19    legal entity.

09:36:06   20    Q.    Those are all of any questions, your Honor.

09:36:08   21         THE COURT:  Mr. Becraft.

09:36:09   22         MR. BECRAFT:  Briefly, your Honor.

09:36:11   23         THE COURT:  Sure.

09:36:11   24

09:36:11   25

CROSS-EXAMINATION

BY MR. BECRAFT:

Q.    Do you have the Defense Exhibit 11 in front of you?

A.    Not in front of me.  No.

THE COURT:  Here.

MR. BECRAFT:  May I approach, your Honor?

THE COURT:  Yeah.  You don't need my permission.

THE WITNESS:  Thank you.

Q.    (BY MR. BECRAFT) Now, your calculations exclude the items that are footnoted in this exhibit, am I correct?  The difference between your calculations and Mr. Tovar's calculations arise from in the middle of the page, or the left-hand side, the words "deduct payments," that's one line, "report compensation's" one line, deduct payments to sales tax.

Do you see those lines?

A.    I do.  Yes.

Q.    All right.  So the real difference between your position and his position is based upon what's footnoted in this exhibit.  Am I correct?

A.    I don't know that.  I just received this right before, and there's a lot that goes behind this, so to speak, that would support this information.  It deviates from mine.  And there are these three notations, and so, I can't speak to how they work into specific computations or specifically how they were treated.

Q.    Okay.  Well, let's talk about the difference.  You had been

09:37:36  1  talking, at least for the last week, with Mr. Tovar.

09:37:38  2  A.    Yes.

09:37:39  3  Q.    About the basis for your calculation of tax liability,

09:37:42  4  right?

09:37:43  5  A.    Correct.  Yes.

09:37:44  6  Q.    And you understand what his position is about the

09:37:47  7  calculation of the tax liability, right?

09:37:48  8  A.    I understood what his position was prior to this morning.

09:37:52  9  Q.    Right.

09:37:52  10  A.    As I said, I received this just before proceedings.

09:37:55  11  Q.    And you mentioned that one difference is the corporate

09:38:00  12  profits, what he has done is he's treated all of the money that

09:38:05  13  was paid to Mr. Antolik for the years in questions, he's treated

09:38:10  14  those as, you know, some type of income to allow for corporate

09:38:15  15  deduction rather than it being, you know, still in DBS.  Am I

09:38:19  16  correct?  Or is that a question you can't understand?

09:38:24  17  A.    Yeah.  Could you go ahead and just ask it again, just to

09:38:27  18  make sure?

09:38:28  19  Q.    Okay.  You treat the payments that were made by DBS to Mr.

09:38:34  20  Antolik in one fashion.  Am I correct?

09:38:36  21  A.    Constructive dividends, is that what you're asking?

09:38:38  22  Q.    I guess.  Is that your position, they're constructive

09:38:41  23  dividends?

09:38:41  24  A.    Yes.  If it's not on payroll, I would treat it as

09:38:43  25  constructive dividends.

| | | |
|---|---|---|
| 09:38:44 | 1 | Q.   Right.  And he treats it in a different fashion.  Am I |
| 09:38:47 | 2 | correct? |
| 09:38:47 | 3 | A.   I believe that -- yes.  I'm a little confused by it, but not |
| 09:38:54 | 4 | treating it the same as me, yes. |
| 09:38:56 | 5 | Q.   It was compensation for services. |
| 09:38:58 | 6 | A.   For management services, is that what -- |
| 09:39:01 | 7 | Q.   Right. |
| 09:39:01 | 8 | A.   Okay. |
| 09:39:01 | 9 | Q.   And that would make it deductible to the corporation.  Am I |
| 09:39:05 | 10 | correct? |
| 09:39:07 | 11 | A.   If there was a contract between Mr. Antolik and DBS Services |
| 09:39:12 | 12 | to provide management services under defined terms for defined |
| 09:39:18 | 13 | compensation, I would be speculating a little bit, but |
| 09:39:23 | 14 | conceptually I would think so. |
| 09:39:25 | 15 | Q.   Okay.  And the other difference is the deductibility of the |
| 09:39:29 | 16 | sales tax money.  Am I correct?  The $321,000.  The difference |
| 09:39:34 | 17 | between you as related to that issue, how to treat the payments |
| 09:39:39 | 18 | made to Mr. Antolik, you have one way of viewing them, he has a |
| 09:39:44 | 19 | different way.  Am I correct? |
| 09:39:45 | 20 | A.   Absolutely. |
| 09:39:46 | 21 | Q.   All right.  And then, there's another dispute regarding the |
| 09:39:50 | 22 | deductibility of the $321,000 in sales taxes that were paid in |
| 09:39:55 | 23 | approximately the year 2000. |
| 09:39:57 | 24 | A.   It would not be deductible in 2000 to an entity that did not |
| 09:40:01 | 25 | incur the expenses. |

09:40:02  1  Q.   All right.   And he has taken that into consideration.   Am I

09:40:06  2  correct?

09:40:06  3  A.   Well, no.   It says on here that he's deducting the $321,000

09:40:13  4  in 2000.

09:40:14  5  Q.   Right.   So we have two major areas.   You have one opinion,

09:40:18  6  he has another opinion that relate to how you treat the payments

09:40:23  7  made to Mr. Antolik.   He does it one way, you do them another

09:40:26  8  way.   That's one area of dispute.

09:40:28  9  A.   Okay.

09:40:29  10  Q.   And the other area of dispute is -- relates to deductibility

09:40:33  11  of the sales taxes.   You don't take into consideration the

09:40:38  12  deductibility of the sales tax.   Am I correct?

09:40:40  13  A.   It's absolutely not deductible.

09:40:41  14  Q.   All right.   And he has --

09:40:43  15  A.   Yes.

09:40:44  16  Q.   All right.   Nothing further, your Honor.

09:40:50  17       MR. ZISSERSON:   I have nothing further, your Honor.

09:40:53  18       THE COURT:   Mr. Tovar says he's taken into

09:40:55  19  consideration all of these bank accounts.   I don't know that we

09:41:03  20  know all of the bank accounts.   We know those that were mentioned

09:41:06  21  in the trial.

09:41:07  22       THE WITNESS:   Yes, sir.

09:41:08  23       THE COURT:   He had nominees, maybe friend, maybe

09:41:17  24  family, whatever, that he would sign their names and operate out

09:41:21  25  of cash withdrawals.   Are all of those accounts taken into your

09:41:29  1  figures?

09:41:29  2          THE WITNESS:  Yes, sir.

09:41:30  3          THE COURT:  That you know of.

09:41:31  4          THE WITNESS:  Yes, sir.

09:41:32  5          THE COURT:  And on the application of the guidelines, I

09:41:35  6  see where you disagreed with the probation officer who has it at

09:41:40  7  about 1.2 million to 960-something-thousand dollars.

09:41:48  8          THE WITNESS:  Yes, sir.  I misinterpreted the

09:41:49  9  guidelines and had applied -- I believe that there's a different

09:41:54  10  percentage when returns are filed, as opposed to when returns are

09:41:56  11  not filed.

09:41:57  12          THE COURT:  So what is -- so the record is clear,

09:42:01  13  because we have lots of figures.

09:42:06  14          THE WITNESS:  Yes, sir.

09:42:06  15          THE COURT:  And it's hard for me to know what y'all

09:42:14  16  have redone since the trial.  We know Mr. Tovar was operating

09:42:20  17  simply on information provided to him by the defendant at the

09:42:25  18  time of trial on both his early returns and in one he prepared

09:42:36  19  for trial.  And we know certain corporate returns, corporate

09:42:45  20  entities that he was filing a new one and then, another one and

09:42:51  21  another one, and you tried to reconstruct all of that.

09:43:00  22          THE WITNESS:  Yes, sir.

09:43:01  23          THE COURT:  Using his corporate -- I'm just going to

09:43:10  24  say shields.  His corporate things.

09:43:14  25          THE WITNESS:  Yes, sir.

09:43:23    1          MR. ZISSERSON:  Your Honor, if I may interject for a

09:43:25    2    moment, I think to the extent there's any confusion, the final

09:43:31    3    number under the guidelines calculation that the government

09:43:34    4    believes is correct is Exhibit B.  That is conceptually the same

09:43:40    5    as we've submitted that was in the original version of the PSR.

09:43:44    6    But we made an error in the calculation and corrected it.  So I

09:43:48    7    don't think there's actual agreement with the probation

09:43:54    8    officer -- I mean, disagreement with the probation officer.  Our

09:43:55    9    second calculation is the correct one using the correct

09:43:57   10    percentages.

09:43:58   11          THE COURT:  Which is the $900,000 figure?

09:44:01   12          MR. ZISSERSON:  Yes.  I think including the sales tax,

09:44:03   13    it comes up a little bit over a million dollars, but that is

09:44:07   14    Exhibit B that we just submitted, and it was Exhibit B to our

09:44:12   15    sentencing memo.

09:44:28   16          THE COURT:  Well, you have the $900,000 figure.  It's

09:44:37   17    when you backed out the sales tax.

09:44:42   18          THE WITNESS:  Yes, sir.  That's correct.

09:44:43   19          THE COURT:  So that's the difference between the two.

09:44:46   20          MR. ZISSERSON:  Yes.

09:44:50   21          PROBATION OFFICER:  The 916,000 would be the

09:44:52   22    restitution.

09:44:53   23          THE COURT:  Right.  I understand under the guidelines.

09:44:56   24          PROBATION OFFICER:  Yes, sir.

09:45:12   25          THE COURT:  I also noticed in the latest packet of

09:45:18  1    information I got where in a three-week period, he took $90,000,

09:45:25  2    generally around $5,000 each withdraw, cash withdrawals.  Did you

09:45:34  3    examine those?

09:45:35  4            THE WITNESS:  Yes, sir.  I received records from Wells

09:45:40  5    Fargo Bank.

09:45:40  6            THE COURT:  And as I take it, he was going -- well, you

09:45:44  7    know, the math is easy.  That's 18 withdrawals if they were 5,000

09:45:51  8    apiece.  Were you able -- did you channel where any of that went?

09:45:56  9            THE WITNESS:  It was taken in currency, and I have no

09:45:59  10   idea where that money went.

09:46:08  11           THE COURT:  Do you have any idea where he would get all

09:46:10  12   of his cash if Tovar's return was correct?

09:46:18  13           THE WITNESS:  Well, I believe this money came from --

09:46:24  14   forgive me, I could be wrong, but I believe that this money came

09:46:27  15   from payments pursuant to installment -- for lack of a better

09:46:31  16   word, installment agreement on the sale of a piece of property.

09:46:35  17           THE COURT:  Well, it's true, but it was cash in the

09:46:37  18   bank.

09:46:38  19           THE WITNESS:  Yes, sir.

09:46:38  20           THE COURT:  Yeah.  Okay.  Any other questions?

09:46:44  21           MR. ZISSERSON:  No, your Honor.

09:46:45  22           THE COURT:  Mr. Becraft, any other questions?

09:46:48  23           MR. BECRAFT:  Not of this witness, your Honor.

09:46:49  24           THE COURT:  All right.  You may step down.  It's your

09:47:04  25   objection.  Do you have any other evidence you wish to --

09:47:07  1         MR. BECRAFT:  No more evidence, your Honor.

09:47:08  2         THE COURT:  All right.  Government have any other

09:47:10  3  evidence on that?

09:47:13  4         MR. ZISSERSON:  No, we don't, your Honor.

09:47:21  5         THE COURT:  Well, the Court finds that the application

09:47:25  6  of the guidelines is correct, that $916,000 was accurately

09:47:42  7  calculated as to the restitution figure, which is the figure that

09:47:49  8  we have computed with the guidelines.  Even if I would accept the

09:47:59  9  677,000, it's in the same guideline rank.  So the objection

09:48:08  10  technically is overruled.

09:48:12  11        And you can proceed to the next.  Any other statements,

09:48:33  12  Mr. Becraft, you want to make on the other objections?  They're

09:48:36  13  really comments.  They're not --

09:48:39  14         MR. BECRAFT:  None further, your Honor.

09:48:40  15         THE COURT:  Okay.  All right.  So the record stays at

09:49:17  16  the same on the government's calculations with regard to the

09:49:20  17  guideline range of 41 to 51 months.

09:49:26  18        I did receive and have reviewed carefully the

09:49:28  19  government sentencing memorandum, the defendant's sentencing

09:49:31  20  memorandum, but you can extend on that in your final statements.

09:49:44  21  So if you'll come forward.

09:49:48  22         MR. BECRAFT:  If you're asking me if I want to make any

09:49:50  23  further arguments regarding the matters covered in my sentencing

09:49:54  24  brief, I don't care to, your Honor.

09:49:56  25         THE COURT:  Well, you have that option.

09:49:58  1          MR. BECRAFT:  Yeah.

09:49:59  2          THE COURT:  As he does.  So that figure for the

09:50:24  3  restitution is $916,358 so the record will be clear.

09:50:31  4          Mr. Antolik, before I sentence you, you have the right

09:50:34  5  to say anything that you wish.  You're not required to say

09:50:36  6  anything, but you certainly have that right.  I'll listen to

09:50:41  7  anything you'd like to say.

09:50:44  8          THE DEFENDANT:  Your Honor, I'll defer to my attorneys.

09:50:46  9          THE COURT:  All right.

09:50:48  10         MR. BECRAFT:  I think we know what the picture is, your

09:50:50  11  Honor.  I don't have anything further to add.  The Court's heard

09:50:52  12  the trial.  Court's heard the evidence we've presented here at

09:50:55  13  sentencing.  I can't -- there's nothing further I can add.

09:51:00  14         MR. BRITTAIN:  Briefly, your Honor, I'd just like to

09:51:02  15  say, I know the Court reads every letter that's given the Court

09:51:06  16  carefully, and that there's another side to this gentleman other

09:51:09  17  than his -- to say extreme bad judgment is an understatement in

09:51:14  18  terms of filing these zero returns and playing fast and loose

09:51:18  19  with all this stuff.

09:51:19  20         If the jury had taken a substantial bathroom break,

09:51:23  21  their deliberations would have been doubled.  They had no problem

09:51:25  22  with it.  This court had no problem with it.

09:51:27  23         THE COURT:  Well, they didn't believe anything he said.

09:51:29  24         MR. BRITTAIN:  I agree and that's apparent.  But there

09:51:32  25  is another side to the man and he has no criminal record.  I

09:51:36 1    simply ask the Court to consider this is not going to be a walk

09:51:40 2    in the park for a gentleman who's never been in trouble, you

09:51:44 3    know, criminal sentence, or done any time, to consider the low

09:51:48 4    end of that guideline range.  That's all.

09:51:51 5         THE COURT:  Well, one of the things that's troubling

09:51:54 6    me -- a lot of things trouble me.  Sentencing, there's no

09:51:58 7    appropriate way to sentence people from one day suspended to 100

09:52:05 8    years in prison.  This is gnawing on me because I listened to the

09:52:14 9    testimony of all the manipulation, whether it was trying to hide

09:52:21 10   money from his two wives or family and establishing of these

09:52:33 11   accounts with different people, and then, even having a person he

09:52:37 12   was pseudo dating, giving her checks to get cash, and the lady

09:52:45 13   who worked for him who testified that he took all of -- took

09:52:54 14   personal -- all of his personal expenses out of the corporate

09:52:57 15   accounts, and she kind of kept the records.

09:53:01 16        All of that, of course, was evidence that I think

09:53:09 17   influenced the jury over a long period of time, years, 15 years

09:53:15 18   as a matter of fact, and that's -- would he have any explanation,

09:53:22 19   either of you, that you feel like you can do?  It looks like he's

09:53:28 20   still doing it.

09:53:29 21        One of the things that jump out at me is the

09:53:31 22   government's figure of $1.2 million, which I've reduced down to

09:53:40 23   the 916 as far as guideline calculation is concerned.  So the

09:53:51 24   government thought it was about -- and then, you look on his

09:53:55 25   financial statement, he has loaned to his brothers and CGN

09:54:06   1   Investment Company 1.3 million.  One wonders where he got it, and

09:54:13   2   one wonders how he got it out so that the government or not

09:54:19   3   anybody is going to get it.  There's blanks in here that you

09:54:27   4   can't do it, but one brother, 12,000, one brother, 24,000, one

09:54:32   5   brother, 190,000, one brother, 545,000, and his investment trust,

09:54:43   6   $525,000.  Almost exactly what the government calculates he went

09:54:46   7   through without reporting.

09:54:50   8         It's a coincidence that doesn't match.  And why anybody

09:54:56   9   needs to, in three weeks, take 18 deposits cash of 5,000 or less

09:55:07  10   without explanation is bothersome, too.

09:55:13  11         All right.  I have a motion for a sentence under the

09:55:21  12   guidelines.  I have motion for over the guidelines.  Y'all have

09:55:28  13   the first bit, but you don't want to bite.

09:55:32  14         MR. BECRAFT:  I'll let the Court decide based on the

09:55:35  15   paperwork.

09:55:35  16         THE COURT:  Then I'll hear from the government, if they

09:55:37  17   wish to speak.

09:55:40  18         MR. ZISSERSON:  Judge, as I calculate it now, we're at

09:55:43  19   an offense level of 22, which would be a range of 41 to 51

09:55:50  20   months.  We think as an initial matter --

09:55:54  21         THE COURT:  That's correct.

09:55:55  22         MR. ZISSERSON:  Okay.

09:55:56  23         THE COURT:  Of course, in the consideration is a

09:55:58  24   3553(a), 3553 sentence where for the benefit of those that are in

09:56:08  25   the courtroom, the Court has discretion when he considers the

09:56:18  1  nature and circumstance of the offense, the history and

09:56:21  2  characteristics of the defendant, the seriousness of the offense,

09:56:28  3  to promote the respect for the law, to provide punishment for the

09:56:34  4  offense, adequate deterrence to criminal conduct, and to protect

09:56:38  5  the public from further criminal conduct to the defendant.

09:56:43  6       The government has, along those lines, indicated that

09:56:48  7  you think a sentence should be higher than the guidelines.  So

09:56:51  8  tell me why.

09:56:52  9       MR. ZISSERSON:  Yes, your Honor.

09:56:53  10      At the very least, it should be in the upper level of

09:56:56  11 the guidelines.  So at the very least, the government would

09:56:58  12 request a sentence of 51 months, but a variance upward is

09:57:03  13 appropriate here.  Mr. Antolik is in Criminal History Category I.

09:57:09  14 He has never been arrested before for anything serious that we

09:57:13  15 know of.  But that criminal history category doesn't really take

09:57:17  16 into account his actual history of criminal conduct.

09:57:22  17      What we presented at trial had a 15-year pattern of

09:57:26  18 lying, cheating and stealing, and that pattern didn't stop when

09:57:32  19 the conduct he was charged with stopped.  We saw, as the Court

09:57:37  20 mentioned, two weeks before the trial, he's tried to avoid

09:57:41  21 reporting requirements of the Bank Secrecy Act by the structuring

09:57:46  22 of his -- secret structuring out of his bank account.  That's on

09:57:49  23 the eve of trial.

09:57:51  24      And in the trial itself, although the Court did deny

09:57:57  25 the government's motion to have obstruction enhancement, it is

09:58:03  1   relevant that even during the trial, he was lying and was --

09:58:08  2   submitted, what appeared to be, a fabricated document into

09:58:12  3   evidence.  And that Mr. Antolik is somebody who apparently does

09:58:15  4   not get the message of when it's time to stop this behavior.

09:58:20  5        It's important to note that when he was structuring the

09:58:23  6   funds out of his account, he was on supervised release.  So we

09:58:29  7   believe that the Court needs to send Mr. Antolik personally a

09:58:31  8   message that you cannot get away with this.

09:58:34  9        THE COURT:  He wasn't on supervised release.  He was on

09:58:37  10  bond.

09:58:39  11       MR. BECRAFT:  Yeah.

09:58:39  12       THE COURT:  It's a big --

09:58:41  13       MR. ZISSERSON:  I'm sorry.  Your Honor, that's correct.

09:58:44  14  You're correct.  I misspoke.

09:58:45  15       But while on bond, a condition of -- I gotta be honest,

09:58:50  16  I can't remember the conditions of bond in this case, but the

09:58:53  17  condition is usually that he not commit any more crimes, and

09:58:55  18  there he was, committing crimes two weeks before his trial.  So

09:58:59  19  in addition to the 3553(a) factors that would promote general

09:59:08  20  deterrence for crimes like this, it is important to provide

09:59:13  21  specific deterrence to Mr. Antolik in the future.

09:59:16  22       This is a guy who every time has scratched the surface,

09:59:19  23  we find more lies, and the state tax return is a great example of

09:59:23  24  that.  Agent Fannin's a federal agent, I'm a federal prosecutor.

09:59:27  25  We're at the time investigating him for state tax returns.  We

09:59:31 1 stumble -- when we look at the state tax returns, we find more

09:59:35 2 lies. The same thing with the bank account. We're not -- we

09:59:39 3 look at Mr. Antolik's bank account two weeks before the trial,

09:59:42 4 which we didn't find out until after the trial. There we go, we

09:59:45 5 find more financial crimes. It never stops. The deeper that you

09:59:51 6 dig, the more that you find on Mr. Antolik. And so, it's

09:59:55 7 appropriate for the Court to vary upwards by at least one level.

09:59:59 8 The government now would request two levels up to a

10:00:03 9 level 24 and to sentence Mr. Antolik at 60 months, which would be

10:00:07 10 five years. It would be one year for each count of his

10:00:12 11 conviction. Thank you.

10:00:18 12 MR. BECRAFT: May I say something in mitigation, Judge?

10:00:21 13 THE COURT: That's why you're here. But let's follow

10:00:22 14 the pattern.

10:00:24 15 MR. BECRAFT: All right.

10:00:25 16 THE COURT: Does probation have anything they want to

10:00:28 17 speak on the record?

10:00:29 18 PROBATION OFFICER: No, your Honor.

10:00:29 19 THE COURT: Okay. Now, anybody that's in the audience

10:00:34 20 has the right to speak. There's several people here. There's

10:00:37 21 several people, most of you, I guess, have written me letters.

10:00:42 22 I've read every damn letter I've received, which has been a lot

10:00:46 23 of letters, and they're highly contrasted letters. But in

10:00:56 24 federal court, you have the right to say anything. I would ask

10:00:59 25 you to be as efficient in saying if you wish.

10:01:04   1              Anybody wish to speak at this sentencing?

10:01:07   2              Mr. Becraft.

10:01:09   3              MR. BECRAFT:  On that point about the cash withdrawals,

10:01:11   4   you know, he was calling me in June -- and tell me if I'm

10:01:18   5   correct.  He was having problems with his bank account at that

10:01:22   6   time.  Somebody had -- could you tell the Court what particular

10:01:25   7   problem you were having with your Wells Fargo account?

10:01:29   8              THE DEFENDANT:  Yeah.  Somebody hacked into my account

10:01:31   9   and withdrew large amounts.

10:01:34  10              MR. BECRAFT:  And how much was taken out?

10:01:36  11              THE DEFENDANT:  It was $10,000 stuff from USAA.  Just

10:01:43  12   real bogus withdrawals and just kind of --

10:01:47  13              MR. BECRAFT:  Now, are you saying that you weren't

10:01:49  14   doing some of these cash withdrawals?  Are you saying that

10:01:52  15   there's somebody else that was doing something to your account?

10:01:54  16              THE DEFENDANT:  Somebody else was hacking into the

10:01:56  17   account and I got scared.

10:01:58  18              THE COURT:  It's your testimony here in this courtroom

10:02:01  19   that 18 -- approximately 18 cash withdrawals at around $5,000 was

10:02:14  20   going out in cash in less than a month or month's area, these

10:02:23  21   weren't yours?

10:02:24  22              THE DEFENDANT:  No.  Those were mine, but somebody

10:02:25  23   hacked into my account and sent me into withdrawing it because I

10:02:29  24   didn't want to be short funds for my defense.  I didn't know how

10:02:32  25   much I'd need for all of this and I didn't want to be --

10:02:36    1            THE COURT:  Well, why --

10:02:37    2            MR. BECRAFT:  What prompted the cash withdrawal, Judge,

10:02:39    3    is what he's saying is the problem he had with somebody

10:02:43    4    attempting to hack into his bank account.

10:02:45    5            THE COURT:  Well, I can understand that.  Not 18

10:02:48    6    separate withdrawals.  That kind of defies logic.

10:03:01    7            Okay.  Give me a second.  I've got too many papers

10:04:10    8    here.  You know, Mr. Antolik, you are a naturalized citizen, come

10:05:02    9    over here.  I don't know what your past history was with either

10:05:06   10    of the two wives other than what I've heard in the courtroom and

10:05:13   11    what I've read in letters.  But the basic facts are clear that

10:05:24   12    even from the beginning, you were mingling your personal business

10:05:28   13    with the professional business culminating in trying to hide

10:05:37   14    assets for years and years on the two divorce cases that you've

10:05:41   15    had.  Had the same effect as hiding it on the taxes.

10:05:46   16            But counsel's right, this went on for 15 years.  And

10:05:55   17    it's like all of the cash withdrawals where you set up a friend,

10:06:03   18    or young friend, or relative in one occasion, and you run money

10:06:07   19    through an account and you sign his checks to you and you take

10:06:13   20    the cash out.  Another place where cash was hidden for a period

10:06:20   21    of time and unbeknownst to the person who's in charge of the

10:06:27   22    account.

10:06:28   23            You even used people like the young lady who testified

10:06:33   24    here who relied on you that this was just a way that you were

10:06:40   25    getting cash because of your divorce and you had to do that

because of the divorce.  And the evidence shows you used Mr. Mata, nice gentleman, older now, and I'm sure he was more alert then.  But he ran a business of cleaning buildings, and when your business took him in, he was in charge of the crews that would clean the business.  And then, when you hadn't had any income tax filed for a period of years, you made him vice-president, and you backed up those four years.  Well, that looks fishy.  Everything that happened in this trial is fishy.

And your explanation fell flat with that jury. Counsel's right, they could hardly get into the jury room before they could bring in the verdict on all five counts.  There's no doubt in my mind you lied under oath in this room.  This room I've spent my life in because when people come into the courtroom and lie under oath, we lose the quality of law.

So when I look at the sentencing guidelines that the government wants me to go up on, the nature and circumstance of the offense, you know, you're not only cheating your family, your wives and ex-wives and the government, which is our country -- it's a serious offense.

The history and characteristics, excludeing the 15 years of manipulation on the money and not filing returns and then, filing stupid returns, and then, filing returns while Mr. Tovar, who you give the information to and he's trying to do his best to help -- his first returns were meaningless because of the information or the lack of information you gave him.  So it's a

10:09:15 1    serious offense.

10:09:18 2            Respect for the law, nothing has been in respect of our

10:09:23 3    law since the indictment has been filed.  A just punishment for

10:09:28 4    the offense, and adequate deterrence to others not to do the same

10:09:34 5    thing, and to protect you from further -- to protect others from

10:09:40 6    further crimes, I think the application of an upward departure is

10:10:01 7    one that should be done in this case.

10:10:34 8            This is not a typical tax evasion case.  I've tried a

10:10:39 9    lot of cases.  Your lawyers have tried a lot of cases.  It

10:10:47 10   doesn't -- the others, some because they didn't believe in the

10:10:55 11   tax law and others just love their money too much and didn't want

10:11:00 12   to pay taxes, but they didn't use other parties to further your

10:11:07 13   scheme over a long period of time.  As I say, Mr. Mata, 45

10:11:13 14   percent ownership, he was a good employee because he never -- and

10:11:22 15   Derek Shannon, stepson, Joyce Rodriguez, Brianne Grothues,

10:11:30 16   G-R-O-T-H-U-E-S, you just used people.  Used people for your own

10:11:35 17   benefit.  And I'm not going to go over all of that stuff, but

10:11:42 18   it's the way it is.

10:11:55 19           On Count 1, I'm going to sentence you to 36 months.

10:12:51 20   Count 2, I'm sentencing you to 36 months.  They will run

10:13:00 21   concurrently.  Count 3, 36 months.  Count 4, 36 months.

10:13:09 22   Thirty-six -- 3 and 4 will run concurrent, but consecutive to 1

10:13:13 23   and 2.  And on Count 5, I sentence you to 36 months, and it will

10:13:21 24   run concurrent to Count 1 for a total of 72 months of

10:13:29 25   incarceration.

10:13:31  1          I set three-year supervision on each of the counts, all

10:13:36  2   to run concurrent for --

10:13:40  3          PROBATION OFFICER:  Your Honor, has to be one year

10:13:41  4   total for supervised release by statute.

10:13:44  5          THE COURT:  Okay.

10:13:44  6          PROBATION OFFICER:  Yes, sir.

10:13:45  7          THE COURT:  Well, they're all going to run concurrent.

10:13:49  8   One year on each of the five counts to run concurrent.  In

10:14:17  9   addition to the standing rules for supervision, I put the

10:14:22  10  following special rules on that supervision:

10:14:27  11         You will not incur any new credit charges or open any

10:14:31  12  additional lines of credit without the approval of the United

10:14:34  13  States probation officer and this court, unless you are in

10:14:38  14  compliance with any payment schedules that I set.  You will not

10:14:44  15  make application for any loan or enter into any credit

10:14:47  16  arrangement without first consulting the probation officer and

10:14:51  17  obtaining instructions from the Court.  That doesn't mean you

10:14:54  18  can't do it.  You just have to, in advance, tell them what you

10:14:58  19  do.

10:14:59  20         You will maintain a single checking account in your

10:15:02  21  name and will deposit into the account all income, monetary

10:15:08  22  gains, or other pecuniary proceeds, and make use of this account

10:15:12  23  for the payment of all expenses.  All other bank accounts must be

10:15:16  24  disclosed to the probation officer.  You can have any other

10:15:20  25  accounts, you just must disclose them and make sure the probation

10:15:26  1   officer is aware of them.

10:15:28  2        If you maintain any business or enterprise, you will

10:15:32  3   request, surrender, and make available for review any and all

10:15:37  4   documents and records of the business or enterprise upon the

10:15:39  5   request of the probation officer.  You will apply all moneys

10:15:46  6   received from income tax return refunds, which is ironic, lottery

10:15:53  7   winnings, judgments, or other anticipated or unexpected financial

10:15:58  8   gains to the outstanding court-ordered financial obligations.

10:16:08  9        If it's determined by the IRS that you have a tax

10:16:12  10  liability, you will cooperate with the IRS to try to satisfy your

10:16:18  11  financial obligations.  And because of the nature of your conduct

10:16:26  12  in the testimony of the trial and subsequent, you will submit

10:16:32  13  your person, property, house, residence, vehicle, papers,

10:16:35  14  computers, or other electronic communication, or data storage

10:16:40  15  devices, or media to a search conducted by the United States

10:16:44  16  probation officer.  Failure to submit to a search may be grounds

10:16:48  17  for revocation of release.

10:16:50  18       You will warn any occupant that the premises may be

10:16:54  19  subject to searches pursuant to this condition.  Any search must

10:16:59  20  be conducted at a reasonable time and in a reasonable manner.

10:17:03  21  The probation officer to conduct such a search must have

10:17:06  22  reasonable suspicion that you may have violated a condition of

10:17:10  23  supervision or a violation of the law.

10:17:14  24       The IRS is the victim of this offense based on the

10:17:19  25  counts of conviction.  It is ordered that you make restitution to

10:17:23  1  the IRS in the amount of $916,358 to their address at 333 West

10:17:36  2  Pershing Avenue, Kansas City, Missouri, 64108.  And you must pay

10:17:42  3  $100 for each felony conviction, for a total of $500, which you

10:17:47  4  must pay immediately or work off at your earliest opportunity.

10:17:54  5        Anything else?

10:17:56  6        PROBATION OFFICER:  No, sir, your Honor.

10:17:58  7        THE COURT:  My last obligation to you, Mr. Antolik, is

10:18:00  8  to give you --

10:18:02  9        THE CLERK:  Excuse me, Judge, was there a fine, in

10:18:05 10  addition to the --

10:18:05 11        THE COURT:  No.  There's no fine because of the

10:18:07 12  restitution.

10:18:21 13        And I'm going to seal and file the presentence

10:18:36 14  investigation and the lawyer's objections.  I have connected

10:18:42 15  them.  Nobody could come in and read about you, Mr. Antolik.

10:18:48 16  Here, here's the second part.  All of the letters I received that

10:18:54 17  I reviewed are quite personal.  I'm going to seal those and put

10:19:00 18  them in my file in case somebody ever needs them.

10:19:07 19        And I'm giving you a letter, which merely states what

10:19:11 20  the law is, and that is, that you have 14 days from today to tell

10:19:18 21  your lawyers to file a notice of appeal so that you can appeal

10:19:22 22  every point that you wish in this case.  You must file that

10:19:26 23  notice of appeal in 14 days or you waive it.  But your lawyers

10:19:31 24  know that, so there's no problem with that.

10:19:35 25        I have a motion for bond.  What the government's

10:19:37  1   position on bond?

10:19:39  2             MR. ZISSERSON:  The government opposes it, your Honor,

10:19:43  3   as we stated in our --

10:19:44  4             THE COURT:  So does the Court.  I overrule.

10:19:49  5             MR. BECRAFT:  Voluntary surrender, your Honor?

10:19:50  6             THE COURT:  No.  He's going to be surrendered right

10:19:52  7   now.  If you'll take him in custody.  I'm in recess for ten

10:20:02  8   minutes.

          9             (End of proceedings.)

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                              * * * * * *

2

3

4   UNITED STATES DISTRICT COURT )

5   WESTERN DISTRICT OF TEXAS    )

6

7       I, LILY I. REZNIK, Certified Realtime Reporter, Registered

8   Merit Reporter, in my capacity as Official Court Reporter of the

9   United States District Court, Western District of Texas, do

10  certify that the foregoing is a correct transcript from the

11  record of proceedings in the above-entitled matter.

12      I certify that the transcript fees and format comply with

13  those prescribed by the Court and Judicial Conference of the

14  United States.

15      WITNESS MY OFFICIAL HAND this the 5th day of January, 2017.

16

17

18                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
19                              Official Court Reporter
                                United States District Court
20                              Austin Division
                                501 W. 5th Street, Suite 4153
21                              Austin, Texas 78701
                                (512)391-8792
22                              Certification No. 4481
                                Expires:  12-31-18
23

24

25

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*